UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

FILED
07 MAY -3 AM 9:34
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

In the Matter of the Search of

The residence located at:
1423 Laytonville,
Chula Vista, CA 91913

APPLICATION AND AFFIDAVIT
FOR SEARCH WARRANT

CASE NUMBER: 07 MJ 0966

I  Rosalinda Conde  being duly sworn depose and say:

I am a(n)   Special Agent with the Drug Enforcement Administration   and have reason to believe
               Official Title

that ___ on the person of or  X  on the property or premises known as (name, description and or location)

See attachment A

in the Southern District of California, there is now concealed a certain person or property, namely (describe the person or property to be seized)

See attachment B

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)

the fruits, instrumentalities and evidence

concerning violations of 21 U.S.C. § 1028 and Secs. 846 and 841(a)(1).

The facts to support a finding of Probable Cause are as follows:

See attached affidavit and attachments- continued on the attached sheet and made a part hereof.

_____
Signature of Affiant

Sworn to before me, and subscribed in my presence

5/3/07 @ 9:10 AM    at    San Diego, California
Date/Time issued

Honorable C. Bencivengo
United States Magistrate Judge          _____
Name and Title of Judicial Officer        Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS

I, Rosalinda Conde, being duly sworn, declare and state:

## A. INTRODUCTION AND EXPERTISE

1. I am a "law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. I have been employed as a Drug Enforcement Administration (DEA) Special Agent since September 2004. I am currently assigned to the San Diego Field Division, Enforcement Group 1, and have been since January 2005. I am currently assigned to investigate illicit drug trafficking organizations operating in and around San Diego, California and Mexico.

3. I received sixteen (16) weeks of training at the DEA Justice Training Center Academy located at the Federal Bureau of Investigation (FBI) Academy in Quantico, Virginia, where I became familiar with how controlled substances are consumed, manufactured, packaged, marketed and distributed.

4. Prior to my employment as a Special Agent of the DEA, I was a Special Agent of the Department of Homeland Security, Immigration and Customs Enforcement (ICE) (formerly known as United States Customs Service), and was so employed from March 2003 to September 2004. As a Special Agent of ICE, I was assigned to the Office of the Resident Agent in Charge, San Ysidro, California, and was cross-designated by the DEA to conduct narcotics-related investigations and enforce provisions of the United States Federal Controlled Substance Act, Title 21, United States Code.

5. Since January 2005, and including up to the present time, I have been assigned to the DEA, San Diego Field Division, located in San Diego, California. Specifically, I have been assigned to a multi-agency federal task force who's primary responsibility and function is to investigate the illicit drug trafficking and money laundering related activities of the Arellano-Felix Drug Trafficking Organization.

6. As a Special Agent of the DEA, I have participated in several narcotic investigations of alleged criminal violations of the Controlled Substances Act Laws. I have participated in narcotic investigations and have conducted numerous surveillances in connection with narcotic investigations. I am familiar with the operations of illegal drug trafficking organizations in the United States and Mexico, including those organizations whose operations involve the distribution of wholesale quantities of marijuana, cocaine and methamphetamine.

7. During the course of this investigation, multiple federal agents and I have interviewed numerous witnesses, confidential sources, and cooperating defendants with relevant information. In addition, multiple federal, state, and local law enforcement agents and I have reviewed and discussed documents and reports, spoken with other federal, state, and local law enforcement personnel, prepared reports concerning the activities of the Herrera-Vera Organization. The facts and opinions set forth below are based on my training and experience and personal participation in the investigation, as well as the above-noted information gathered and shared among local, state and federal agents, as well as the analysis of documents and telephone records; physical surveillance; arrests and seizures. Based on my personal participation in this investigation and information made known to me by other law enforcement personnel, I believe that the facts contained in the following paragraphs are true.

8. Through my training and experience, I have learned that individuals involved in drug trafficking:

   a. Frequently communicate with co-conspirators by means of mobile communications facilities, cellular telephones and electronic paging devices and usually maintain these items on their person and/or in their vehicles, vessels, and or residences. Such communication devises often have multiple functions, including voice mail and text messaging which can be stored for extended periods of time.

   b. Use maintain records and ledgers evidencing drug trafficking activities in order to keep track of the ordering, purchasing, storage, distribution and transportation of drugs. Furthermore, through my training and experience, I have seen an increase in the use of mobile communication facilities to send, receive and store such records. In fact, I have seen instances where, even after the drugs are sold, documentary records and ledgers remain for long periods of time to memorialize past transactions, the status of the accounts receivable and accounts payable, and the names, identities and telephone numbers of suppliers, customers and co-conspirators.

   c. Individuals involved in drug trafficking must often rely on others to obtain their drugs and to help them market the drugs. Frequently, traffickers maintain evidence of the identities of these co-conspirators at their residence. Furthermore, through my training and experience, I have seen an increase in the use of mobile communication facilities to send, receive and store such records.

///

2

B. **REQUESTED SEARCH WARRANTS**

9. Based upon my participation in this investigation, and on the basis of the above sources of information, I submit that the facts contained in the numbered paragraphs below demonstrate that there is probable cause to believe that the fruits, instrumentalities, and evidence of violations of Title 21, United States Code, Sections 846 and 841(a)(1), will be found at the following locations:

a. The premises described as 1423 Laytonville Place, Chula Vista, California (the residence of Argelia Herrera and Herrera-Vera);

b. The premises described as 5886 Streamview Drive Apartment #4, San Diego, California (the residence of Jose Herrera-Vera);

C. **FACTS AND CIRCUMSTANCES ESTABLISHING PROBABLE CAUSE**
   **INVESTIGATION OVERVIEW**

10. Set forth in the paragraphs below are the facts and circumstances learned during the course of this investigation, which demonstrate the probable cause to search the locations specified in paragraph 9. I begin with an overview of significant events, including details of the meetings and surveillance that occurred with the target subjects. The final portion of my affidavit concerns the requested search locations and the evidence I believe will be found inside those locations. Because this affidavit is being submitted for the limited purpose of seeking authorization for search warrants for the above-noted residences, I have not set forth each and every fact learned during the course of this investigation. Rather, I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the requested search warrants.

11. Octavio Herrera-Vera, (**HERRERA-VERA**) is the leader of a narcotics distribution organization, hereinafter referred to as the "Herrera-Vera Organization." During the course fo the investigation, *via* confidential informants, post arrest interviews and numerous wire intercepts agents have learned that, the Herrera-Vera Organization is a vertical distribution organization which independently acquires controlled substances from sources within Mexico; and coordinates its subsequent transportation to Tijuana, Mexico. Once the controlled substances are imported into the United States, the Herrera-Vera Organization coordinates further distribution of the controlled

substances to locations throughout the United States. In addition to these distribution activities the Herrera-Vera Organization also transports and launders resulting shipments of bulk-cash proceeds.

12. During the course of this investigation, agents have identified *inter alia* the following members of the Herrera-Vera Organization:

    a. Octavio Herrera-Vera (**HERRERA-VERA**) is the leader of the Herrera-Vera Organization. **HERRERA-VERA** oversees the independent acquisition and transportation of methamphetamine, cocaine and heroin from Southern Mexico to Tijuana. Once the drugs are imported, **HERRERA-VERA** organizes and oversees their distribution to locations throughout the United States;

    b. Argelia Herrera (**A. HERRERA**) is the wife/girlfriend of **HERRERA-VERA** who coordinates and personally transports outgoing shipments of drugs and incoming shipments of bulk cash proceeds. **A. HERRERA** also uses her aliases to "legitimately" acquire bank accounts, residences and vehicles for the Herrera-Vera Organization.

    c. Jose Herrera-Vera (**J. HERRERA**) is Octavio **HERRERA-VERA**'s brother who coordinates Herrera-Vera Organization distribution efforts in the Southern District of California and Boston.

    d. Leobaldo Herrera-Vera (L. Herrera) is Octavio **HERRERA-VERA**'s brother who oversees Herrera-Vera Organization activities within Mexico, such as acquiring and coordinating load cars and load drivers. L. Herrera also coordinates the transportation of money to suppliers in Mexico and the subsequent purchase of narcotics from those suppliers.

    e. Jose Ramon Duran-Madera (Duran-Madera) is Octavio **HERRERA-VERA**'s brother-in-law who operates a stash house in Los Angeles County, where he facilitates the transportation of narcotics by couriers from the east coast. Duran-Madera also collects drug proceeds from couriers, and coordinates transportation of bulk-cash currency to Mexico.

D. **INCIDENTS ESTABLISHING PROBABLE CAUSE**

13. Between August 12, 2002 to the present, agents have linked the Herrera-Vera Organization to the distribution of multi-kilogram quantities of cocaine and methamphetamine. I have summarized these events below.

///

4

**August 12, 2002 Seizure of 7.75 Kgs. of Cocaine, Grand Island, Nebraska.**

14. On August 12, 2002, state law enforcement authorities in Nebraska arrested Dagoberto Cedano-Medina who was transporting approximately 7.75 kilograms of cocaine. After serving approximately five years of his resulting custodial sentence, Cedano-Medina agreed to be interviewed by investigating agents. During this interview, Cedano-Medina explained that **HERRERA-VERA** personally recruited him to transport the aforementioned cocaine from San Diego to Grand Island, Nebraska.

**January 20, 2004 Seizure of 4 Kgs. of Cocaine, Meridian, Mississippi.**

15. On January 20, 2004, state law enforcement authorities in Mississippi arrested Linda Kirk who was transporting four kilograms of cocaine. Kirk served a five year custodial sentence for her role in the aforementioned distribution venture. During an interview on December 12, 2006, Kirk stated that **HERRERA-VERA** had personally asked her to transport the aforementioned cocaine.

**October 21, 2005 Seizure of 2.3 Kgs. of Methamphetamine in Albuquerque, New Mexico.**

16. On October 21, 2005, state law enforcement authorities in New Mexico arrested Marco Parada on a commercial bus while he was in possession of approximately 2.3 kilograms of methamphetamine. During April 2007, Parada agreed to be interviewed by investigating agents. During this interview Parada identified **A. HERRERA** as the individual who personally recruited him to transport the aforementioned methamphetamine as well as prior drug loads. Parada stated that he was recruited in San Diego, California. Parada also identified Duran-Madera as the individual who personally provided him with the methamphetamine to be transported. Moreover, Parada also indicated that, based upon his conversations with **A. HERRERA**, relative to his role as a drug courier, **A. HERRERA** was taking directions from **HERRERA-VERA**. At the time of Parada's arrest the memory for his cellular telephone contained a telephone number used by **A. HERRERA** and **HERRERA-VERA**.

**December 24, 2005 Seizure of 8 Kgs. of Cocaine, Albuquerque, New Mexico.**

17. On November 9, 2005, Carlos Robles-Gonzales met with **A. HERRERA** in National City, CA. Robles-Gonzalez previously transported narcotics from San Diego to an Herrera-Vera Organization customer in Birmingham, Alabama. During a recorded meeting with **A. HERRERA**,

5

1  Robles-Gonzales offered transportation services to **A. HERRERA** for a pending drug load to
2  Birmingham, Alabama. On November 23, 2005, the Birmingham buyer contacted Carlos Robles-
3  Gonzales and inquired about the pending shipment. On December 7, 2007, Carlos Robles-Gonzales
4  learned that **HERRERA-VERA** received 30 pounds of methamphetamine from a supply source in
5  Guadalajara, Mexico. **A. HERRERA**, however, had not called Robles-Gonzales regarding any
6  additional shipments to Birmingham. Later that same day, Carlos Robles-Gonzales stated that if the
7  Herrera-Vera Organization decided not to utilize his transportation services they would likely use a
8  courier named Hector Aguiar. Carlos Robles-Gonzales explained that Aguiar would transport the load
9  using a 2000 red Grand Marquis bearing Arkansas licence plates. Carlos Robles-Gonzales explained
10 further that this particular vehicle had a secret non-factory compartment installed underneath the
11 windshield.

12      18.    Carlos Robles-Gonzales subsequently contacted **A. HERRERA** *via* telephone in a
13 recorded conversation. **A. HERRERA** answered and passed the telephone to **HERRERA-VERA**.
14 Carlos Robles-Gonzales explained that he was interested in transporting drug loads to earn money before
15 Christmas. **HERRERA-VERA** stated that he would keep Carlos Robles-Gonzales in mind.
16 Investigating agents subsequently responded to **HERRERA-VERA**'s then "J" Street residence and
17 observed the 2000 Grand Marquis described by Carlos Robles-Gonzales parked in the residence's
18 driveway. A DMV records check revealed that the 2000 Grand Marquis was registered to Hector Aguiar
19 of Arkansas. Following these observations, agents installed a tracker onto the 2000 Grand Marquis.

20      19.    On December 23, 2005, agents tracked the 2000 Grand Marquis as it left **HERRERA-**
21 **VERA**'s and **A. HERRERA**'s residence. In conjunction with local law enforcement authorities in
22 Albuquerque, New Mexico, the 2000 Grand Marquis was pulled over by means of a traffic stop.
23 Pursuant to this traffic stop, agents learned that the driver, Hector Aguiar, was transporting
24 approximately 8.3 kilograms of cocaine which was hidden in a secret compartment under the windshield.
25 Aguiar had **A. HERRERA**'s phone number listed within his cellular telephone.
26 ///
27 ///
28 ///

**June 13, 2006 Purchase of One Pound of Methamphetamine, National City, California.**

20. On June 13, 2006, CS-8[1], during a recorded telephone conversation, called L. Herrera and asked about the purchase price for one pound of methamphetamine. Later that same day, L. Herrera called CS-8 and explained to CS-8 that he [L. Herrera] told **J. HERRERA** to get the methamphetamine and deliver it to CS-8. During the course of subsequent surveillance, agents observed **J. HERRERA** and Juan Fuentes-Garibay deliver approximately one pound of methamphetamine to CS-8 and an undercover agent.

**July 11, 2006 Seizure of 7.85 Kgs. of Cocaine, Otay Mesa POE.**

21. On July 11, 2006, law enforcement officers at the Otay Mesa POE arrested Fabiola Molina who was in possession of approximately 7.85 kilograms of cocaine. Molina has been identified as the girlfriend of Marco Parada. Molina's cellular telephone contained phone numbers listed as "Arge" and "Argelia," and showed an incoming call from "Arge" at 12:43 a.m. the day of the arrest (Molina was in secondary inspection at the time). Molina's phone also received a text message at 3:57 a.m. from "Arge" asking where Molina was and stating Arge was hungry and wanted to meet for a hamburger. Additionally, Molina had $17,500.00 in uncashed checks written to her, all on the same date, from a bank account in the name of *"Herminia Garza,"* one of **A. HERRERA**'s aliases. Based on the foregoing facts I believe that "Arge" and "Argelia" refer to **A. HERRERA**.

**July 13, 2006-seizure of 24 Pounds of Methamphetamine, Little Rock, Arkansas.**

22. On July 13, 2006, **A. HERRERA** traveled to Little Rock, Arkansas and met Jon Tipton. Tipton and **A. HERRERA** picked up two Dominican couriers (a male and a female) at an Arkansas bus station, then went to a hotel room in Little Rock. The meeting in the hotel room was audio and video recorded. **A. HERRERA**, the two Dominican couriers, and Tipton removed packages of methamphetamine from suitcases that the Dominican couriers had brought. During the course of cutting and repackaging the methamphetamine, all four individuals briefly left the hotel room intending to temporarily leave the methamphetamine behind. During this time, investigating agents clandestinely

---

[1] CS-8 is a paid source who has provided information during the course of this investigation. CS-8 was previously convicted of drug trafficking charges. Much of CS-8's provided information is consistent with or has been corroborated by other aspects of this investigation. As far as agents are aware, CS-8 has never knowingly provided them with any false information while cooperating.

7

1  entered the hotel room and seized approximately 24 pounds of methamphetamine. Agents in Arkansas
2  subsequently obtained hotel records which indicated that the room was rented by Rosangela Martinez.
3  During a safety valve interview, Fabiola Molina told agents that she had been directed by **A.
4  HERRERA** to drive a Dominican male and a Dominican female named "Rosangela" from San Diego
5  to Los Angeles, just prior to Fabiola Molina arrest on July 11, 2006. Fabiola Molina also stated that
6  after transporting the Dominican male and female to Los Angeles they were picked-up by a person
7  named "Ramon."

8  **August 11, 2006 Southbound Cash Seizure, SYPOE.**

9  23.    On August 16, 2006, Maria De Los Angeles Flores-Uribe was stopped at the San Ysidro
10 POE. Flores-Uribe had approximately $70,000.00 in U.S. currency in her purse and was attempting to
11 enter Mexico as a pedestrian. Shortly thereafter, **A. HERRERA** was intercepted explaining that she had
12 dropped off "Angela" who was supposed to walk southbound across the SYPOE pedestrian bridge and
13 into Mexico. **A. HERRERA** also stated that L. Herrera was waiting for "Angela" in Mexico but that
14 she never arrived. **A. HERRERA** also stated that both **HERRERA-VERA** and L. Herrera told her that
15 she should have used a vehicle with a hidden compartment.

16 **HERRERA-VERA Intercepted Coordinating Drug Shipment to Boston, Massachusetts.**

17 24.    During a series of intercepted calls between September 2 and September 6, 2006, agents
18 learned that **HERRERA-VERA** sent a shipment of drugs to purchasers on the East Coast of the United
19 States. Specifically, **HERRERA-VERA** was to send the narcotics, *via* courier, and his purchaser, in
20 turn, would send a courier to deliver cash proceeds to **HERRERA-VERA**.

21 **September 11, 2006 Seizure of 2 lbs. Methamphetamine in Albuquerque, New Mexico.**

22 25.    On September 11, 2006, in Albuquerque, New Mexico, during a routine traffic stop, a
23 police officer stopped Irasema Colado-Estrada and Alicia Quintero-Hernandez in a Chrysler 300M with
24 California plates. This vehicle was registered in the names of Ramon Duran and Herminia Garza (an
25 alias used by **A. HERRERA**). A subsequent search of the car found approximately two pounds of
26 methamphetamine concealed inside a secret non-factory compartment. Colado-Estrada and Quintero-
27 Hernandez both told the arresting officer that the car belonged to a friend. Quintero-Hernandez provided
28

the arresting officer with a phone number known to be used by **A. HERRERA**. On September 6, 2006, investigating agents had observed **HERRERA-VERA** driving this vehicle.

26. On September 13, 2006, **A. HERRERA** was intercepted speaking about the seizure of the aforementioned methamphetamine. **A. HERRERA** explained that the seizure took place in Albuquerque, New Mexico. **A. HERRERA** also stated that the load was hidden in **HERRERA-VERA**'s car.

**October 6, 2006 Seizure of 12 Kgs. of Cocaine in Grand Junction, Colorado.**

27. On October 6, 2006, in Grand Junction, Colorado, during a routine interdiction operation at a Grand Junction Greyhound Bus Station, task force agents arrested David Rivera-Rios and Rigoberto Delarosa-Morla. Rivera-Rios and Delarosa-Morla were traveling from Los Angeles, California to St. Louis, Missouri, and each possessed a suitcase containing approximately 6 kilograms of cocaine in a false compartment. The cellular telephone possessed by Rivera-Rios contained a known Nextel direct connect number for Jose Ramon Duran-Madera. At the time of their arrest, both Rivera-Rios and Delarosa-Morla admitted they were transporting the cocaine from Los Angeles, and Rivera-Rios said he was transporting the cocaine at the direction of *"Tavo"* an alias used by **HERRERA-VERA**. David Rivera-Rios subsequently pled guilty and was interviewed. During that interview, Rivera-Rios stated that he was hired by *"Tavo"* about a year before his arrest. Rivera-Rios further said he made multiple trips to transport drugs and currency for *"Tavo,"* including one trip when $72,000 in currency was seized from him at the Los Angeles airport.[2]

**December 5, 2006 Seizure of 7.85 Kgs. of Cocaine at the SYPOE.**

28. On December 5, 2006, Juan Fuentes-Garibay was arrested at the SYPOE while in possession of 7.85 kilograms of cocaine hidden in a secret non-factory compartment of the vehicle he was driving. Fuentes-Garibay was in possession of a cellular telephone which had the telephone numbers of Duran-Madera, and **J. HERRERA** as well as various telephone numbers used by **HERRERA-VERA**.

///

---

[2] On February 14, 2006, a total of $143,000 in U.S. currency was seized by officers at the Los Angeles airport from David Rivera-Rios and Emanuel Rivera-Mulero. David Rivera-Rios was in possession of $72,000.

9

**December 10, 2006 Seizure of 7.74 Kgs. of Cocaine in Albuquerque, New Mexico.**

29. On December 10, 2006, during a routine interdiction operation at an Albuquerque, New Mexico train station, agents arrested Julian Eduardo Capellan. Capellan was traveling one-way from Los Angeles to Boston and was in possession of a duffel bag containing about 7.75 kilograms of cocaine in a false compartment. Additionally, Capellan's cellular telephone contained a number under the name "Ramon L A."

**January 10, 2007 Seizure of 10.9 Kgs. of Cocaine, Otay Mesa POE.**

30. On January 10, 2007, at the Otay Mesa POE, Marco Antonio Avila was arrested while attempting to import approximately 10.9 kilograms of cocaine into the United States from Mexico. Avila's vehicle, a Jeep Liberty SUV, was registered to 8309 Aqua View, Spring Valley, California, a residence previously used by **HERRERA-VERA** and **A. HERRERA**. The memory of Avila's cellular telephone listed calls to **HERRERA-VERA** and L. Herrera on January 10, 2007. A similar Jeep Liberty SUV driven by **HERRERA-VERA** on March 21, 2007, was previously also registered to Avila. After Avila was arrested, that Jeep was registered in an alias name used by Ramon Duran-Madera. That Jeep was impounded on March 21, 2007, and **HERRERA-VERA** was intercepted asking Duran-Madera to get the Jeep out of impound. Intercepts also indicated that employees at the impound lot had informed Ramon Duran-Madera that DEA had searched the Jeep. **A. HERRERA** was subsequently intercepted discussing with **HERRERA-VERA** a suspicion that law enforcement was interested in the Jeep driven by **HERRERA-VERA** due to the fact that it had previously been registered to Avila.

**May 2, 2007 Seizure of approx. 3 Kgs. of Cocaine, Salt lake City, Utah.**

31. On May 1, 2007 agents were conducting surveillance at 1423 Laytonville Place, the residence of **A. HERRERA** and **HERRERA-VERA**. During the course of this surveillance agents observed a black Cadillac Escalade SUV, driven by L. Herrera, departing from the residence. On many prior occasions investigating agents have previously observed **A. HERRERA** as the usual and regular driver of this particular Cadillac Escalade SUV. Agents followed this Escalade SUV to a location near Rancho Cucamonga, California where L. Herrera met with **HERRERA-VERA** and Duran-Madera. During this meeting agents observed Duran-Madera retrieve a suitcase from a nearby vehicle occupied by his [Duran-madera's] wife and place this suitcase in the Cadillac Escalade SUV. Thereafter, all three

individuals departed the location in the Cadillac Escalade SUV and traveled to the Ontario International Airport. At the airport agents observed Jose Cruz leave the airport terminal and enter, as a passenger, in the aforementioned Cadillac Escalade SUV. The Cadillac Escalade SUV then traveled to a nearby Greyhound bus station where Jose Cruz purchased a one-way ticket to Salt Lake City, Utah. When Jose Cruz arrived in Salt Lake City agents contacted him and, pursuant to a consent search, located three kilograms of cocaine hidden in Jose Cruz' duffle bag. Jose Cruz subsequently admitted that he was a hired courier who traveled to the Los Angeles area for the purpose of transporting drugs.

32. During, but not limtied to, the months of September through October 2007 **J. HERRERA** was intercepted as he engaged in on going Herrera-Vera Organization trafficking activities. As recently as April 15, 2007, **J. HERRERA** was intercepted speaking with **HERRERA-VERA,** who subsequently spoke to L. Herrera, all regarding a load of drugs, believed to be methamphetamine, that was to be imported by the Herrera-Vera Organization from Tijuana Mexico to San Diego, California. Moreover, during the April 15, 2007 call, **J. HERRERA** and **HERRERA-VERA** discussed the status of drug proceeds that needed to be transported to an unknown location.

E.     **REQUESTED SEARCH LOCATIONS**

**Argelia Herrera and Herrera-Vera's residence**

33.    The premises described as 1423 Laytonville Place, Chula Vista, California is the residence of **A. HERRERA** and **HERRERA-VERA**. **A. HERRERA** used to live with **HERRERA-VERA** at another residence and recently moved to 1423 Laytonville Place. During the course fo the investigation and through wire intercepts agents have learned that **A. HERRERA** and **HERRERA-VERA** have an ongoing romantic relationship. **A. HERRERA**, moreover, is believed to be pregnant with **HERRERA-VERA**'s child. During the course of surveillance agents observed **A. HERRERA** remove her personal belongings from the previous residence she shared with **HERRERA-VERA**, transport these belongings to 1423 Laytonville Place and subsequently move her belongings into the residence at 1423 Laytonville Place. Subsequent to these observations, and on numerous occasions, most recently on April 28, 2007, agents observed **A. HERRERA** at the 1423 Laytonville Place residence. **A. HERRERA** has been observed at this residence during the early morning and late evening hours. **A. HERRERA**'s primary vehicle, a black Cadillac Escalade has been regularly parked at the

1423 Laytonville Place residence. Moreover, **A. HERRERA**'s late-night cellular telephone activity is picked up via cellular tower that services the location where 1423 Laytonville Place is located. Based on the foregoing information agents believe that 1423 Laytonville Place is the primary residence of **A. HERRERA and HERRERA-VERA**.

**Jose Herrera-Vera's residence**

34.  The premises described as 5886 Streamview Drive, apartment #4, San Diego, California is the residence of Jose Herrera-Vera. During the course of the investigation agents of regularly observed **J. HERRERA** at this residence, as recently as during the week of April 30, 2007. Moreover, agents previously observed **J. HERRERA** move his personal belongings from a prior residence and move them into the 5886 Streamview, #4 residence. On May 2, 2007, a vehicle regularly used by **J. HERRERA** was parked in the front driveway of the 5886 Streamview Drive, #4 residence.

**F.     BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANTS**

35.  Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit, I know that:

    a.   Individuals involved in drug trafficking often maintain at their residence and/or place of business records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution and transportation of drugs. At times, the drugs may be sold, but documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers, and coconspirators.

    b.   Individuals involved in drug dealing must often rely on others to obtain the drugs and to help them market the drugs and evidence of the identities of these criminal associates is often maintained at their residence and/or place of business.

    c.   Individuals involved in drug dealing utilize mobile telephones to maintain contact with co-conspirators and to conduct their criminal activity. The Herrera-Vera Organization regularly used various and changing cellular telephones which they would typically abandon upon any law enforcement activity related to their trafficking activities. Cellular telephones used in this fashion

contain data concerning telephonic contact with co-conspirators as well as phone books containing telephone numbers for co-conspirators. Therefore, I request authorization to seize all mobile telephones found at the locations to be searched and to search the telephones' electronic phone books, date books, and records of telephonic contacts, including text and voice messages, to include all mobile telephone accessories, including, but not limited to, batteries and phone chargers, SIM cards, and pre-paid phone cards.

   d. Based on prior searches of premises used by individuals involved in drug trafficking, I believe I will find articles of personal property evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises or property therein.

   e. Individuals involved in drug trafficking will often conceal evidence of their drug dealing in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence. Therefore, I am requesting permission to search all vehicles located on the premises associated with the respective Target Locations and their residents.

   f. Individuals involved in drug trafficking earn sums of money and often try to legitimize these profits. In order to do this they attempt to secret, transfer and conceal the money by, among other ways: (1) placing assets in names other than their own to avoid detection while maintaining control; (2) laundering the money through what appears to be a legitimate business or businesses; (3) hiding money in their homes, business locations, safes and safety deposit boxes; or (4) using the money to buy assets which are hard to trace. Records of these transactions are often found at their residence and/or place of business.

   g. Individuals involved in drug trafficking will often maintain weapons, firearms and ammunition on their person or at their residence and cars in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs. Therefore, I am requesting permission to seize weapons, firearms, magazines, and ammunition that may be found at the above-described locations.

   h. Individuals involved in drug trafficking often take photographs of themselves, their associates, their property, and their controlled substances. Drug traffickers often maintain these

13

1  photographs at their residences or in their vehicles. Therefore, I am requesting permission to search the
2  residences listed within this warrant and it's attachment(s) for and to seize photographs that law
3  enforcement agents determine to be of evidentiary value.

4  　　　36.　It is also my opinion and belief that the above-described documents are permanently
5  possessed by drug traffickers much the same way a legitimate business will maintain records and tools
6  of its trade whether or not the business has a particular item in inventory on a given date. These
7  documents are kept by drug traffickers whether or not the trafficker is in possession of any drugs at any
8  given moment. I believe that the seizure of such documents will provide evidence of the events set forth
9  in this affidavit and that such documents can be found in the search locations to be searched despite any
10  lapse of the time between the events described and the anticipated search pursuant to this warrant.

11  　　　37.　The investigation into the criminal activities of the above individuals reveals that their
12  drug distribution activities are ongoing. Due to the quantities of narcotics being distributed and the
13  relatively sophisticated manner in which the above individuals conduct their illegal activities, I believe
14  they have been engaged in the illegal sale of narcotics for a long period of time. Based on my training
15  and experience, I believe that the criminal activity described above is, by nature, self-perpetuating.

16  　　　38.　Based upon my experience and training, consultation with other law enforcement officers
17  experienced in drug and financial investigations, and all the facts and opinions set forth in this affidavit,
18  I believe that the items set forth in Attachment B, which evidence violations of the Title 21, United
19  States Code, Sections 846 and 841(a)(1), conspiracy to distribute cocaine, will be found at the above-
20  noted locations.
21  / / /
22  / / /
23  / / /
24  / / /
25  / / /
26  / / /
27  / / /
28  / / /

## SEALING REQUEST

39. Because of the ongoing nature of this investigation, I am requesting that this affidavit, the search warrants, and all other associated court records be ordered sealed until further order of the court, as disclosure of any of the above would hamper further investigative efforts.

Rosalinda Conde
Special Agent
Drug Enforcement Administration

SUBSCRIBED and SWORN to before me this __3rd__ day of May 2007.

UNITED STATES MAGISTRATE JUDGE
CATHY ANN BENCIVENGO

15

# ATTACHMENT A

Description of 1423 Laytonville, Chula Vista, CA 91913

The target residence is a two story single family residence having a grey colored wood siding exterior with white trim and a light brown colored cement tile roof. The numbers 1423 in black numerals on the west-facing portion of the residence are located to the right of the front door. Black colored numerals (1423) are also affixed to the rear facing portion of the residence next to a garage. The attached garage has a metallic roll up door that is grey in color.



# ATTACHMENT "B"

1. Documents containing data reflecting or memorializing the ordering, possession, purchase, storage, distribution, transportation and sale of controlled substances, including buyer lists, seller lists, pay-owe sheets, records of sales, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, Rolodexes, telephone bills, telephone answering pads, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and key.

2. Money, assets, and evidence of assets derived from or used in the purchase of controlled substances and records thereof, including but not limited to United States currency, negotiable instruments and financial instruments including stocks and bonds, and deeds to real property, books, receipts, records, bank statements and records, business records, money drafts, money order and cashiers checks receipts, passbooks, bank checks, safes and records of safety deposit boxes and storage lockers.

3. Weapons, firearms, firearms accessories, and ammunition and documents relating to the purchase and/or possession of such items.

4. Documents and articles of personal property reflecting the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises to be searched or property therein, including keys, rental agreements and records, property acquisition records, utility bills and receipts, photographs, answering machine tape recordings, telephone, vehicle and/or vessel records, canceled mail envelopes, correspondence, financial documents such as tax returns, bank records, safety deposit box records, canceled checks, and other records of income and expenditure, credit card records, travel documents, personal identification documents and documents relating to obtaining false identification including birth certificates, drivers license, immigration cards and other forms of identification which the same would use other names and identities other than his or her own.

6. Cellular/mobile phones (and their contents), and other communication devices which evidence participation in a conspiracy to possess, manufacture, or distribute controlled substances.

7. All incoming telephone calls received at the residence during the execution of the search warrant and all calls received on cellular telephones found during the execution of the warrant.

8. Devices used to conduct counter-surveillance against law enforcement, such as radio scanners, police radios, surveillance cameras and monitors and recording devices and cameras.

9. Photographs and video and audio recordings which document an association with other coconspirators and/or which display narcotics, firearms, or money and proceeds from narcotics transactions.

1